**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **RONALD L. FUTTERMAN,** ) | |
| ) | |
| **Plaintiff,** ) | **Case No.: 20-cv-06722** |
| ) | |
| **v.** ) | |
| ) | |
| **UNITED EMPLOYEE BENEFIT** ) | |
| **FUND; GARY MEYERS and** ) | |
| **JOHN FERNANDEZ, individually and** ) | |
| **in their capacity as the BOARD OF** ) | |
| **TRUSTEES of the UNITED** ) | |
| **EMPLOYEE BENEFIT FUND; and** ) | |
| **DAVID FENSLER, individually and** ) | |
| **in his capacity as PLAN** ) | |
| **ADMINISTRATOR of the UNITED** ) | |
| **EMPLOYEE BENEFIT FUND,** ) | |
| ) | |
| **Defendants.** ) | |

## <u>COMPLAINT</u>

Plaintiff Ronald L. Futterman, by and through his attorneys, Dowd, Bloch, Bennett, Cervone, Auerbach, and Yokich, by way of his Complaint against Defendants United Employee Benefit Fund; Gary Meyers and John Fernandez, individually and in their capacity as the Board of Trustees of the United Employee Benefit Fund; and David Fensler, individually and in his capacity as the Plan Administrator of the United Employee Benefit Fund, states as follows:

1.      Plaintiff is a participant in the United Employee Benefit Fund (the "Benefit Fund") through which, until Plaintiff is approximately 90 years old (he is now 77), his beneficiaries are entitled to a death benefit from an insurance company now part of VOYA Financial, Inc. ("VOYA Financial") worth between $1,000,000 and $1,500,000. In May 2020, Plaintiff first learned that the defendant Trustees of the Benefit

Fund had decided to reduce his death benefit by 30%. Plaintiff brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA") to protect his death benefit and reverse the reduction because it violates ERISA and the plan documents governing his benefit. (The individual defendants and Benefit Fund are referred to herein as "Defendants.")

2.      Further, after Plaintiff first learned of the reduction in his death benefit, beginning on May 22, 2020 (all further dates are 2020 unless otherwise indicated), Plaintiff requested from Defendants Meyers and Fensler all the documents under which the plan is operated, including documents related to the benefit reduction.  Pursuant to ERISA Section 104(b)(4), a plan administrator is required to provide a participant or beneficiary a copy of "the latest updated summary plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated" within 30 days of a written request.  29 U.S.C. § 1024(b)(4). Nonetheless, Defendants have failed or refused to provide Plaintiff with all of the requested documents that he is entitled to under ERISA. Plaintiff, therefore, also seeks an order from the Court directing the Defendants to provide the requested documents and awarding Plaintiff statutory penalties for the Defendants' failure to timely respond to his requests.

3.      Finally, in investigating the reduction in his death benefit, Plaintiff discovered that the Benefit Fund's government filings disclose that, since at least 2018, the Benefit Fund no longer has any employers obligated to make contributions to the Benefit Fund.  The trust agreement governing the Benefit Fund requires that the "Trust shall terminate upon the occurrence of one or more of the following: (a) the termination

of the obligation of all Employers to make contributions; . . . ." Therefore, Plaintiff seeks an order from the Court directing that the Benefit Fund be terminated. Moreover, the governing trust agreement provides that, upon termination, the Benefit Fund is required to "first pay any obligations of the Trust;" and then "any remaining assets shall be used at the discretion of the Trustees to provide benefits for Participants covered at the time of termination of the Agreement consistent with the purposes of the Trust." Therefore, Plaintiff seeks an order from the Court directing the Defendants to transfer, without any reduction in benefits, ownership to Plaintiff of the life insurance policy on his life now owned by the Benefit Fund in order to provide for Plaintiff's death benefit.

## JURISDICTION, VENUE, AND PARTIES

4.      Plaintiff brings this action under Sections 502(a)(1)(A), (a)(1)(B), (a)(2), and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(A), (a)(1)(B), (a)(2), and (a)(3).

5.      This Court has jurisdiction pursuant to 29 U.S.C. § 1132(e) and (f), 29 U.S.C. § 1451, and 28 U.S.C. § 1331.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 29 U.S.C. § 1132(e), as a substantial part of the events giving rise to Plaintiffs' claims occurred within this District, Defendants reside in this District, and the breaches alleged occurred in this District.

7.      Plaintiff resides in Lake County, Illinois.

8.      Plaintiff has, at all relevant times, been a "participant" as that term is defined by Section 3(7) of ERISA, 29 U.S.C. § 1002(7), of the United Employee Benefit Fund ("Benefit Fund").

9.     Defendant United Employee Benefit Fund ("Benefit Fund") is an "employee benefit plan" as that term is defined by Section 3(3) of ERISA, 29 U.S.C. § 1002(3).

10.     The Benefit Fund maintains its offices in Cook County, Illinois.

11.     Defendants Gary Meyers and John Fernandez jointly comprise the Board of Trustees of the Benefit Fund (the "Board of Trustees"). The Board of Trustees has, at all relevant times, been the Plan Administrator and Plan Sponsor of the Benefit Fund, as those terms are defined by ERISA, 29 USC §§ 1002(16)(A) and (B). Defendants Meyers and Fernandez are fiduciaries with respect to the Benefit Fund as the Board of Trustees is the Plan Administrator and named fiduciary pursuant to 29 U.S.C. § 1102(a) and through the powers they exercise as the Board of Trustees pursuant to 29 U.S.C. § 1002(21)(A)(i).

12.     Defendant Gary Meyers is, on information and belief, an employer-appointed trustee and fiduciary of the Benefit Fund charged with the duty to administer the Benefit Fund solely in the interests of plan participants and in accordance with the governing plan documents, and all applicable laws.

13.     Defendant John Fernandez is, on information and belief, an officer and/or employee of the National Production Workers Union, Local 707 ("NPWU" or "Union"), and a Union-appointed trustee of the Benefit Fund charged with the duty to administer the Benefit Fund solely in the interests of plan participants and in accordance with the governing plan documents, and all applicable laws.

14.     Defendant David Fensler was appointed by the Board of Trustees to act on its behalf as Plan Administrator in connection with day-to-day operations and administration of the Benefit Fund. As Plan Administrator, Defendant is a fiduciary of

4

the Benefit Fund charged with the duty to administer the Benefit Fund in the interests of

plan participants and in accordance with the governing plan documents, and all

applicable laws.

## FACTUAL BACKGROUND

## United Employee Benefit Fund

15.     On information and belief, the Office & Professional Workers Division of

Local 2411 of the Chicago and Central States Joint Board, of the Amalgamated Clothing

and Textile Workers Union ("Local 2411") and certain employers who were members of

the Professional Workers Master Contract Group sponsored and established the

Defendant Benefit Fund in or about 1991. A true and correct copy of the "United

Employee Benefit Fund Trust Agreement," together with certain amendments and a

"Merger Agreement" (collectively referred to as the "Trust Agreement"), provided to

Plaintiff by the Defendants is attached as Exhibit A.

16.     On information and belief, the purpose of the Benefit Fund was to provide

certain employee welfare benefits, including death benefits, to employees of the

employer members of the Professional Workers Master Contract Group who were

signatory employers of collective bargaining agreements with Local 2411.

17.     On information and belief, Local 2411 changed its name to Local 2411,

Office & Professional Workers Division of the Chicago & Central States Joint Board,

UNITE, as reflected in the first Amendment to the Trust Agreement.

18.     On information and belief, sometime between 2000 and 2003, Local 2411

ceased its involvement with the Benefit Fund, and a different union, the NPWU,

succeeded Local 2411 as the only union sponsor of the Benefit Fund. On information and

belief, since at least 2003, all union-appointed trustees of the Benefit Fund, including Defendant Fernandez, have been appointed by the NPWU.

### 1996 – Plaintiff's Initial Participation in the Benefit Fund

19.     In 1996, Plaintiff was a principal and President of Futterman & Howard, Chtd. ("Firm"), a law firm with its principal place of business in Chicago, Illinois.  The other principal at that time was Robert C. Howard, who is now deceased.

20.     In or about 1996, Plaintiff and Howard met with the Firm's then insurance agent, Marshall Katzman, to discuss a proposal which Katzman had brought to the Firm.

21.     Katzman proposed that, if the Firm's employees were to unionize with Local 2411, the Firm's employees and principals could receive death benefits (i.e., life insurance benefits) from the Benefit Fund.

22.     Katzman explained that the Firm, through the Professional Workers Master Contract Group, could negotiate a collective bargaining agreement with Local 2411 to include term life insurance benefits for the Firm's employees through the Benefit Fund, paid for by the Firm's contributions to the Benefit Fund ("Employee Term Life Policies"). Eligibility for the Employee Term Life Policies would end when the covered employee's employment with the Firm ended unless premiums continued to be paid.

23.     As management of the Firm, the Firm's principals would not be represented by Local 2411 or covered by the collective bargaining agreement. The principals would, nonetheless, be permitted to participate in the Benefit Fund through a subscription agreement. Instead of term life insurance policies that would end with termination of employment, the principals would be eligible for a death benefit in the form of Fund-administered universal life insurance policies, paid for by contributions

from the Firm. The principals' universal life insurance policies would provide a vested benefit payable to the beneficiary named on the policy upon the death of the insured principal regardless of the principal's continued relationship with the Firm.

24.     Based on the representations from Katzman, the Firm decided to participate in the Benefit Fund consistent with Katzman's proposal.

25.     In or about 1996, the Firm recognized Local 2411 as the exclusive bargaining representative of its employees. The Firm signed an initial and successor collective bargaining agreements with the union covering the Firm's employees. Those labor agreements, purportedly negotiated by a group of employers called the Professional Workers Master Contract Group, included as a benefit Employee Term Life Insurance Policies as described above through the Benefit Fund.

26.     Consistent with NPWU succeeding Local 2411 as the union sponsor of the Benefit Fund, on or about January 22, 2003, the Firm executed a Recognition Agreement by which it recognized the NPWU as the exclusive bargaining agent of the Firm's employees, replacing Local 2411. On information and belief, all subsequent collective bargaining agreements covering the Firm's employees were with the NPWU and were master agreements negotiated by the Professional Workers Master Contract Group with addenda terms specific to the Firm's employees.

27.     From 1996 through at least 2009 – the year in which Plaintiff retired from the Firm – the Firm paid required policy premiums for the Employee Term Life Policies.

28.     The amount of the death benefit for the Firm's employees and principals to be provided through the Benefit Fund was originally based on a multiplier of two times the respective salaries of the employees or principals, from a salary schedule provided by

the Firm. For Plaintiff, the applicable salary amount was $500,000, resulting in a

universal life insurance policy with a base amount of $1,000,000 (plaintiff's "Death

Benefit").

29.     On information and belief, in or about August 1996, to fund Plaintiff's

Death Benefit, the Benefit Fund purchased a universal life insurance policy on Plaintiff's

life through the Southland Life Insurance Company with a base death benefit of

$1,000,000. The life insurance policy purchased by the Benefit Fund on plaintiff's life is

referred to in this Complaint as "Plaintiff's Life Insurance Policy."

30.     The Benefit Fund issued a Certificate of Benefit to Plaintiff dated August

20, 1996, and signed by Defendant Fensler. The August 20, 1996 Certificate of Benefit

for Plaintiff states the following:

> THIS IS TO CERTIFY that under the terms and conditions of the Master
> Contract agreement between the Professional Workers Master Contract
> Group and the Office and Professional Workers Local #2411, Division of
> the Union of Needletrades Industrial Textile Employees, and of the
> Addendum thereto pertaining to eligible employees of Futterman &
> Howard, Chtd.,
>
> Ronald L. Futterman
>
> is a participant in the Death Benefit Only plan of the United Employee
> Benefit Fund, a Voluntary Employees Beneficiary Association Trust and
> Welfare Benefit Fund;
>
> that the United Employee Benefit Fund has purchased and caused to have
> issued a policy of insurance, #6 00049970 from the
>
> Southland Life Insurance Company
>
> on the life of said participant;
>
> and that, upon proper notice to the United Employer Benefit Fund of the
> death of Ronald L. Futterman, and subject to the terms and conditions of
> the above-noted policy, a benefit in the amount of

**$1,000,000**

will be paid to the beneficiary designated by the participant;

**provided, however**, that in the event of any indebtedness of said participant to the United Employee Benefit Fund for which the aforementioned death benefit is pledged as security, the benefit to which the beneficiary is entitled shall be reduced by the amount of the debt that remains outstanding at the time of said participant's death, plus any interest that has accrued upon such debt as of the date of death.

31.     Between 1996 and 2003, the Firm paid for Plaintiff's and Howard's Universal Life Policies by making six contributions of $50,000 to the Benefit Fund up to a total of $300,000 for each policy. On information and belief, the Benefit Fund used those contributions to make premium payments on Plaintiff's Life Insurance Policy. Thereafter, no further contributions from the Firm were required to keep the Principal Universal Life Policies in full force and effect, through age 90.

32.     On information and belief, including as reflected in statements from the Southland Life Insurance Company and its successors regarding Plaintiff's Life Insurance Policy, the $300,000 in premium contributions plus 4% guaranteed interest were projected to cover the cost of the $1,000,000 life insurance benefit through age 90. The balance of any premium contributions plus interest earnings, in excess of costs of insurance, accumulated as cash value in Plaintiff's Life Insurance Policy.

33.     Plaintiff's Life Insurance Policy had an "increasing" death benefit, which means under the terms of the policy that the death benefit for the insured's beneficiaries could increase to the extent the accumulated cash value in the policy increased. The insured's beneficiaries would be entitled to the $1,000,000 base amount plus the accumulated cash value (less any outstanding loans) in the policy at the time of the insured's (Plaintiff's) death.

9

34.     The Benefit Fund also provided to the Plaintiff a "Summary Plan Description of the United Employees Benefit Fund" (the "SPD") a true and correct copy of which is attached as Exhibit B. On information and belief, the SPD is applicable to the Benefit Fund plan of benefits providing both the Firm's Employee Term Life Policies and the principals' universal life policies, including Plaintiff's Death Benefit.

**The Benefit Fund Agrees to Increase Plaintiff's Universal Life Policy**

35.     On or about October 28, 2010, the Benefit Fund, the NPWU, the Firm, and the Firm's principals, including Plaintiff, agreed to increase the life insurance benefits provided to the Firm's employees and principals through the Benefit Fund. Following the change, the death benefits for the employees and principals were increased from two times salary to three times salary of the respective employee or principal, including the Plaintiff. Pursuant to this change, Plaintiff's Death Benefit increased from $1,000,000 to $1,500,000, calculated using Plaintiff's original $500,000 salary base. A document, signed by Defendant Fensler in his then capacity as a Trustee of the Benefit Fund, titled United Employee Benefit Fund DBO Exhibit 1, Benefit Description for Futterman & Howard, Chtd., memorialized this change in benefits and is attached as Exhibit C (the "2010 Amendment").

36.     Based on the documents received from the Benefit Fund, including the 2010 Amendment, and representations from Defendant Fensler, Plaintiff understood that following this change the potential death benefit for his beneficiaries could be as much as $1,500,000, which would consist of the $1,000,000 base amount of the insurance policy plus up to $500,000 in accumulated cash value.

37.     On information and belief, as a consequence of various corporate transactions among the insurance companies that issued Plaintiff's Life Insurance Policy,

the current issuer of Plaintiff's Life Insurance Policy is Security Life of Denver Insurance Company, a subsidiary of, or related company to, VOYA Financial, Inc., and operated under the VOYA Financial brand.

38.     As of July 22, according to a VOYA Financial verification of coverage for Plaintiff's Life Insurance Policy, the net benefit (i.e., the $1,000,000 base amount plus accumulated cash value, less any loan balance) payable to Plaintiff's beneficiaries was $1,513,015.25.

**In May 2020, Plaintiff Received Notice of**
**the Benefit Fund's Decision to Reduce his Benefit**

39.     On or about May 21, Plaintiff received a letter, dated May 11, from Defendant Gary Meyers, the employer trustee of the Benefit Fund, addressed "To whom it may concern."  The letter, attached as Exhibit D, states as follows:

> In order to maintain the integrity of the United Employee Benefit Trust for the current and future years, the Trustees review the Trust at the conclusion of each calendar year with the fund manager, the fund's legal team and accountants….[sic] this review has been completed.

> As a result of the above, suggestions have been made to improve the overall administrative efficiency of the Trust, strengthen the Trust's legal position and longevity. Please note, that the authority to change plan benefits is included in the Collective Bargaining Agreement, Union Documents and Trust Documents…[sic] all agreed to and signed by participating employers of the American Workers Master Contract.

> The benefit structure was carefully reviewed to determine the longevity of the existing plan. The recommendation to the Trustees would maintain the integrity of UEBF, strengthen and assure continuance of the Trust into the future.

> As the result of these recommendations, for participants 65 and over there will be a 30% reduction of their life insurance death benefit. This is not an unusual benefit structure adjustment…[sic] it is common in most Employee Benefit Programs.

> This recommendation will be implemented effective on or after March 1, 2020.

40.     As of May, Plaintiff was 77 years old, and therefore, he understood the May 11, letter from Defendant Meyers to have adopted a 30% reduction to Plaintiff's death benefit from the Benefit Fund.

41.     On information and belief, Plaintiff's Death Benefit was vested through approximately age 90. The initial contributions from the Firm for the premiums on Plaintiff's Life Insurance Policy and the 4% guaranteed interest to be earned on the premiums were projected to no longer cover the cost of insurance after age 90. Thus, no reduction of benefits in the Benefit Fund could be applied to Plaintiff's death benefit from the Benefit Fund prior to age 90.

**Plaintiff's Requests for Information Related to the Benefit Reduction**

42.     Following receipt of Defendant Meyers' May 11 letter, Plaintiff believed that the Benefit Fund had no right or authority to reduce his benefit, and he wanted to understand the Benefit Fund's purported basis for the reduction. Therefore, beginning on or about May 22, Plaintiff repeatedly wrote to Defendants asking to obtain from them the Benefit Fund plan documents and information regarding his benefit and his rights in the Benefit Fund. He also requested in writing an explanation regarding the basis and authority for the reduction in benefits. Plaintiff invoked his right under ERISA to receive all such documents within 30 days of his written request. Plaintiff's repeated efforts to obtain all of the necessary documents proved to be futile. Some information, described below, was provided, although sometimes long after 30 days.

43.     Plaintiff responded to Defendant Meyers' May 11 letter with a letter to Meyers on May 22 copied by email to Defendant Fensler, the Benefit Fund's plan administrator. In his May 22 letter, Plaintiff requested copies of the "Collective Bargaining Agreement," "Union Documents," and "Trust Documents" referenced in

12

Defendant Meyer's May 11 letter, as well as the 2010 Amendment, increasing Plaintiff's Death Benefit from the Benefit Fund.

44.     By email dated May 27, Defendant Fensler responded to Plaintiff's May 22 letter. Defendant Fensler's May 27 email stated that he had forwarded Plaintiff's May 22 letter to Defendant Meyers. Defendant Fensler also wrote that he had attached to the email "all of the current employer related documents pertaining to the [Firm's] participation in the United Employee Benefit Fund." While the email included some attachments, the "Collective Bargaining Agreement," "Trust Documents," and "Union Documents," referenced in Defendant Meyers's May 11 letter as the basis for the benefit reduction, were not among those attachments. Plaintiff so advised Defendants in subsequent communications.

45.     On June 9, Plaintiff emailed Defendant Fensler again and requested the following information:

a.  Who are the current Trustees of the Plan in addition to Mr. Meyers? Who were the Trustees at the time of the purported adjustment and calculation of benefits specified in Mr. Meyers' May 11, 2020 letter?

b.  Is the proposed adjustment and calculation of benefits applicable only to those who are or were members of the Union?

c.  What specific provisions in the Collective Bargaining Agreement, Union Documents or Trust Documents, referenced in Mr. Meyers' letter dated May 11, 2020 are being relied upon for the adjustment and calculation of benefits specified in the letter?

d.  If the purported adjustment and calculation will be applied to my benefit, is it being applied to the face value of my policy ($1,000,000), or the face value of the policy plus the cash surrender value of up to $500,000?

e.  Other than the Collective Bargaining Agreement, a copy of which you recently provided, are there any other "Union Documents" being relied

upon for the proposed adjustment and calculation of benefits? If so please provide copies of those documents."

f.  Other than the Form 5500 annual report, does the Fund file any other reports with the State of Illinois or federal government?

g.  What is the total number of beneficiaries of the Plan whose benefits have been reduced since March 1, 2020, and potentially could be reduced pursuant to the statements in Mr. Meyers' letter dated May 11, 2020?

46.     Plaintiff's June 9 email to Defendant Fensler also stated that Plaintiff had not received any response to his May 22 letter to Meyers, "which [Fensler] advised had been forwarded to him."

47.     On June 26, Plaintiff sent another email to Defendant Fensler inquiring when Plaintiff could expect a response to his requests for information in his May 22 letter and his June 9 email.

48.     On July 6, Plaintiff sent an email to Defendant Fensler stating Plaintiff's concern that Defendant Meyers had failed to respond to Plaintiff's May 22 letter, and that the Benefit Fund had not responded to a number of Plaintiff's requests for information in that letter.

49.     Plaintiff's July 6 email stated that Plaintiff had been unable to find any language supporting the reduction of benefits in the Benefit Fund trust document and amendments or the master collective bargaining agreement, which the Benefit Fund had provided to Plaintiff. Accordingly, Plaintiff requested the Benefit Fund identify any "specific provisions in either of those documents upon which Mr. Meyers is relying, or in any other document on which he relied, please identify those provisions, and provide copies of such documents that were not previously provided."

50.     In addition, Plaintiff requested through his July 6 email to Defendant Fensler, "all documents comprising the 'review' of the Trust, referenced in Mr. Meyers's May 11, 2020 letter, which supposedly justifies the purported adjustment of benefits recited in that letter. If such 'reviews' were made in 2016, 2017, or 2018, I request copies of all documents pertaining to those reviews."

51.     In his July 6 email to Defendant Fensler, Plaintiff also inquired, "When can I expect a response from Mr. Meyers to my letter dated May 22, 2020, to my prior requests for information and documents that are now more than 30 days old."

52.     Defendant Fensler sent an email to Plaintiff on July 8 at 10:08 a.m., attached as Exhibit E. In that email, Defendant Fensler responded to some of the questions posed by Plaintiff in his June 9 email to Fensler.

53.     In response to Plaintiff's question: "Is the proposed adjustment and calculation of benefits applicable only to those who are or were members of the Union," Defendant Fensler answered in his July 8 email, "The adjustment is not applicable to union members, only to non-union participants."

54.     In response to Plaintiff's question: "What specific provisions in the Collective Bargaining Agreement, Union Documents or Trust Documents, referenced in Mr. Meyers' letter dated May 11, 2020, are being relied upon for the adjustment and calculation of benefits specified in the letter," Defendant Fensler answered in his July 8 email, "In order to preclude providing incorrect information, I am referring this question to Fund counsel."

55.     In response to Plaintiff's question: "If the purported adjustment and calculation will be applied to my benefit, is it being applied to the face value of my policy

($1,000,000), or the face value of the policy plus the cash surrender value of up to $500,000?", Defendant Fensler answered in his July 8 email, "Neither. It does not relate to the policy the Fund owns on your life. Your benefit from UEBF was $1,000,000 based on a multiple of your salary. The adjustment is applied to that death benefit, making your current death benefit $700,000."

56.     In response to Plaintiff's question, "Other than the Collective Bargaining Agreement, a copy of which you recently provided, are there any other 'Union Documents' being relied upon for the proposed adjustment and calculation of benefits? If so, please provide copies of those documents," Defendant Fensler answered in his July 8 email, "In order to preclude providing incorrect information, I am referring this question to Fund counsel."

57.     In response to Plaintiff's question, "What is the total number of beneficiaries of the Plan whose benefits have been reduced since March 1, 2020, and potentially could be reduced pursuant to the statements in Mr. Meyers' letter dated May 11, 2020," Defendant Fensler answered in his July 8 email, "The reduction applies to a class of people and certainly there are more than just yourself. We are not providing the exact number."

58.     Defendant Fensler sent a second email to Plaintiff, dated July 8 at 10:09 a.m., attached as Exhibit F, in response to Plaintiff's July 6, 2020 email which requested, among other things, "all documents comprising the 'review' of the Trust, referenced in Mr. Meyer's May 11, 2020 letter, which supposedly justifies the purported adjustment of benefits recited in that letter." In his July 8 email response, Defendant Fensler wrote: "To my knowledge there were no documents that relate to the 30% reduction in benefits

decision. There were more than a few discussions." Defendant Fensler also wrote, "Out of a desire to provide the correct answer, I am referring your question regarding the authority to change plan benefits to the Fund's counsel."

59.     In response to Defendant Fensler's July 8 email, Plaintiff responded by email dated July 8 at 4:05 p.m., with the additional request, "In light of your reference of certain questions to the Fund's outside counsel, please provide the name and law firm. I will have my counsel get in touch so that the communication process can be shortened."

60.     Plaintiff sent a second email to Defendant Fensler on July 8 at 5:23 p.m., again requesting the plan document governing his benefit, specifically noting the Benefit Fund SPD's reference to a plan document separate from the SPD itself: "Assuming that the Plan document is different than the Trust and Amendments previously provided, I would like to have a copy of the Plan document. Please provide it as soon as possible. If the Plan document is the Trust and Amendments previously provided, please confirm that." To date, neither Defendant Fensler, nor anyone else from the Benefit Fund, has provided to Plaintiff the plan document or provided a confirmation that there is no plan document separate and apart from the Benefit Fund trust agreement and amendments, as requested in Plaintiff's July 8 email.

61.     On July 6, Plaintiff sent another email to Fensler reiterating Plaintiff's requests for information and documents contained in his May 22 letter, including his request for all plan documents governing Plaintiffs' rights and benefits in the Benefit Fund and all documents relied upon by the trustees in reducing Plaintiff's benefit.

62.     On July 15, Plaintiff sent another email to Defendant Fensler once again stating that he had not received a complete response to his May 22 letter and noting that

17

Plaintiff had not heard from the lawyers that Defendant Fensler referenced in his July 8 email.

63.     On or about July 17, Plaintiff received a second letter from the Benefit Fund regarding the reduction of his Death Benefit. A copy of the letter is attached as Exhibit G ("Notice of Reduction").  The envelope containing the letter bore a July 2020 postmark, but the letter was dated February 3.  The letter also has a red ink stamp reading "Second Notice."  The content of the letter was substantially similar to the letter Plaintiff received from the Benefit Fund, dated May 11, and again stated that for participants 65 and older there would be a 30% reduction in life insurance benefits and that the reductions would be implemented effective March 1, 2020. The letter further stated that inquiries should be directed to "Klein Paull Holleb Jacobs, Ltd, c/o L. Steven Platt, 660 LaSalle Place, Highland Park, IL 60035." The letter was signed by "Gary Myers" as the Benefit Fund employer trustee and Defendant Fernandez, also identified as an "Employer Trustee" of the Benefit Fund. On information and belief, the "Gary Myers" who signed the letter was Defendant Meyers.

64.     On August 4, Plaintiff spoke to Defendant Fensler by telephone. Plaintiff had previously sent an email to Fensler to inform him that Plaintiff had contacted VOYA Financial to request a copy of Plaintiff's Life Insurance Policy, that VOYA Financial's customer service representative had stated that the policy could only be mailed to the owner, the Benefit Fund, and that a copy of the policy was being mailed on July 24 to Fensler at the Fund's Northfield, Illinois office. During the phone call, Fensler acknowledged receipt of the email, and said that he would mail the policy to Plaintiff

upon receipt. He further stated that the original policy was in an off-site storage facility with other Fund documents.

65.     During this conversation with Defendant Fensler, Plaintiff mentioned that he had not heard anything from the Fund's lawyers to whom Fensler had referred certain of Plaintiff's requests for information. Fensler responded by stating that he expected to be speaking to the lawyers on "Thursday" (August 6) and would inquire.

66.     On August 10, Plaintiff left a voice mail message for Defendant Fensler that Plaintiff was calling to inquire whether Fensler had received the insurance policy, and, if not, whether Fensler would contact VOYA Financial to request that a copy of the policy be mailed directly to Plaintiff. Plaintiff's message included the policy number, the VOYA Financial customer service number, and Plaintiff's home address. Plaintiff also sent Fensler an email confirming the information left in the voice message.

67.     On August 10, Defendant Fensler sent an email to VOYA Financial customer service and copied Plaintiff on the email. He authorized VOYA Financial to send a copy of the policy to Plaintiff with the following statement: "Please send a copy immediately as Fund's original has been lost."

68.     By letter dated August 12, VOYA Financial mailed Plaintiff a copy of Plaintiff's Life Insurance Policy identifying Plaintiff as the "insured" and the Benefit Fund as the "owner" of the policy.

69.     Plaintiff's Life Insurance Policy states that the application for the policy is a part of the policy contract. However, the application for Plaintiff's Life Insurance Policy was not among the documents provided to Plaintiff by VOYA Financial.

Case: 1:20-cv-06722 Document #: 1 Filed: 11/12/20 Page 20 of 39 PageID #:20

70.     On August 28, Plaintiff called VOYA Financial to request a copy of the Benefit Fund's application for Plaintiff's Life Insurance Policy. Plaintiff finally received a copy of the application from VOYA Financial (not the Benefit Fund) on or about October 22.

71.     During Plaintiff's communications with Defendant Fensler, Fensler disclosed that the Defendants had not reviewed Plaintiff's Life Insurance Policy when making the decision to reduce benefits by 30%. Defendants could not provide a copy of either the application or policy terms without requesting the documents from VOYA Financial, disclosing that the documents were either in storage or lost.

72.     Plaintiff also requested from Defendant Fensler documents and information explaining the loan balance on Plaintiff's Life Insurance Policy.

73.     The annual statement for Plaintiff's Life Insurance Policy covering the period August 20, 2019 through August 19, 2020 (the "2020 Annual Statement"), which Plaintiff received from VOYA Financial, indicates that there is a loan balance on Plaintiff's Life Insurance Policy in the amount of $2,769.61.

74.     Plaintiff did not request any loan to be taken out on Plaintiff's Life Insurance Policy, and he has no knowledge regarding the reason for the loan. Plaintiff has also never taken a loan from the Benefit Fund.

75.     On August 4, Plaintiff spoke with Defendant Fensler over the phone and requested information regarding why the 2020 Annual Statement indicates that there is a loan balance on Plaintiff's Life Insurance Policy. Plaintiff advised Fensler that he had never taken out a loan from the Benefit Fund. Defendant Fensler responded that the

amount of the loan balance was "odd," that he did not know the reason for the loan, and would have to research it.

76.     As of the date of the filing of this Complaint, neither Defendant Fensler nor anyone else from the Benefit Fund has provided any information to Plaintiff about the reason that there is a loan balance on Plaintiff's Life Insurance Policy.

### Plaintiff Discovers Further Improprieties at the Benefit Fund

77.     In the course of investigating the purported basis for the Benefit Fund's reduction in his Death Benefit, Plaintiff discovered additional improprieties at the Benefit Fund, which could materially threaten his rights to, or value of, his Death Benefit.

78.     What limited information Plaintiff has regarding the Benefit Fund's finances is contained in the Benefit Fund's annual IRS Form 5500 filing.

79.     Under ERISA and related regulations, the Benefit Fund is required to attach an independent auditor's report to their Form 5500s, which contains the independent auditor's opinion's regarding the financial statements of the Benefit Fund. But the Benefit Fund has not attached an independent auditor's report to the Form 5500 since 2013 and instead has attached a letter to its annual Form 5500s stating the Benefit Fund is withholding the independent auditor's report.

80.     The Benefit Fund's 2013 Form 5500 demonstrates that the Benefit Fund had 11 outstanding loans to participants, in the total amount of $2,731,193.  (*See* 2013 Excerpts of Form 5500, Independent Auditor's Report, attached as Exhibit H, at p.12.)

81.     The information in the 2013 Form 5500 related to participant loans raises several questions regarding the financial integrity of the Benefit Fund and the compliance of Defendants Fensler, Fernandez, and Meyers with their fiduciary duties.

82.     The 2018 Form 5500 (which, on information and belief, is the latest Form

5500 filed to date by the Benefit Fund) demonstrates that 9 out of 11 of the individuals

identified with loan balances in 2013 had not repaid their loans by 2018, and in almost

every instance, the loan balance increased rather than decreased. In 2018, the balance on

those 9 loans was $3,909,294.

83.     The Independent Auditor's Report in the 2013 Form 5500 indicates that

the loans to participants are collateralized by the life insurance policies of the individuals

who took out the loans. (Ex. H, Form 5500 Excerpts at p. 17, "Schedule G, Part 1.")

However in 2013, at least 8 out of 11 of those loans exceeded the cash-surrender value of

the policy on those respective individuals.  There is no data available on the cash

surrender value of the loans after 2013.  (*Id.* at p.12.)

84.     The chart below, based on the filed annual reports, demonstrates the 2013

loan balances compared to the 2013 cash-surrender values and 2018 loan balances of the

respective loans:

| Individual | 2013 Loan Balance | 2013 Cash-Surrender Value on Policy | 2018 Loan Balance |
|---|---|---|---|
| Crews, T. | $319,151 | $354,542 | $442,836 |
| Matsukado, L. | $128,623 | $96,775 | $812,510 |
| Obermeier, W. | $155,173 | $13,769 | [undisclosed] |
| O'Meara M. | $108,662 | $269,997 | $150,632 |
| Pinn, A. | $567,862 | $69,302 | $597,339 |
| Pinn, D. | $345,199 | $221,638 | $823,364 |
| Riskus, G. | $230,167 | $118,420 | $305,488 |
| Shah, M. | $404,018 | $20,657 | $633,815 |
| Stager, J. | $367,533 | $220,578 | [undisclosed] |
| Torres, K. | $30,413 | $6,209 | $38,495 |
| Zielinski, K. | $73,392 | [undisclosed] | $104,495 |

85.     Section 406(a)(1) of ERISA prohibits Defendants from engaging in the

"lending of money or other extension of credit between the plan and a party in interest"

or "transfer[ing] to, or us[ing] by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1).

86.     All of the individuals with loans in 2013 are identified as "parties in interest" by the Benefit Fund auditors in the 2013 Form 5500.  (Ex. H, Form 5500 Excerpts at pp. 12-16.)

87.     The Independent Auditor's Report in the 2013 Form 5500 discloses that the Benefit Fund wrote off $2,529,743 in participant loans as unpayable in 2013 and wrote off $6,128,844 in participant loans as unpayable in 2012 because the insurance policies for the applicable individuals were no longer in force, and the Benefit Fund therefore issued IRS Form 1099s to those individuals to report the loan balances as income. (Ex. H, Form 5500 Excerpts at p.9.)  The Benefit Fund therefore effectively allowed for an in-life distribution to those individuals contrary to the terms of the plan that provides for benefits only upon the death of participants.

88.     In 2012 and 2013, the amount of loan write-offs constituted about 13% and 28% the Benefit Fund's total assets, respectively.   (*See* Ex. H, Form 5500 Excerpts at p.3.)

89.     To the extent that the Benefit Fund has experienced any financial distress requiring it to evaluate the need to reduce participants' life insurance benefits (including Plaintiff's), the Benefit Fund's imprudent and improper loans to parties in interest that it ultimately wrote-off likely materially contributed to that financial distress, to the detriment of Plaintiff and other participants.

90.     On information and belief, since at least 2018, the Benefit Fund has had no active contributing employers to the Benefit Fund, that is, no employers making new

contributions to the Benefit Fund for the benefit of employees. The Benefit Fund's 2018 Form 5500 completed by the Benefit Fund requires the Benefit Fund to identify the "total number of employers obligated to contribute to the plan," to which the Benefit Fund answered "0."

91.     The Trust Agreement requires that the "Trust shall terminate upon the occurrence of one or more of the following: (a) the termination of the obligation of all Employers to make contributions; . . . ." (Ex. A at Section 9.2.)

92.     Despite the requirement in the Trust Agreement that the Benefit Fund terminate when there were no more employers required to make contributions to the Benefit Fund and, as of at least 2018, there were no longer any employers with such an obligation, the Benefit Fund trustees, Defendants Fernandez and Meyers have failed to terminate the Benefit Fund.

93.     Section 403(d) of ERISA, 29 U.S.C. § 1103(d)(2) provides that the "assets of a welfare plan which terminates shall be distributed in accordance with the terms of the plan[.]"

94.     On information and belief, upon the termination of the Benefit Fund, the Benefit Fund would be required to transfer ownership of Plaintiff's Life Insurance Policy to Plaintiff within one year of plan termination. Nonetheless, the Benefit Fund has failed to do so.

95.     Instead, the Benefit Fund has continued incurring unnecessary administrative expenses to operate a plan that should be terminated.  For example, based on the information in the Benefit Fund's Form 5500, in 2018 the Benefit Fund incurred

$1,167,546 in administrative expenses, constituting more than 88% of the total plan

expenses for 2018.

96.      By comparison, an independent 2019 report analyzing the Form 5500s of

1,320 multiemployer welfare plans found a median ratio of administrative expenses to

total plan expenses of 5.6%[1].

### The Benefit Fund's Internal Review and Appeals Procedures are Inapplicable to Plaintiff's Claims

97.      The Benefit Fund's internal review and appeals procedures do not apply to

Plaintiff's claims for relief which are not claims for benefits under the plan of the Benefit

Fund. Plaintiff's requests for documents needed to determine his rights to his life

insurance benefit have been withheld or denied by the Defendant trustees, plan

administrator, and their agents. Plaintiff's requests for documents that were the basis for

the benefit reduction have been denied in violation of ERISA or, alternatively,

Defendants violated their fiduciary responsibilities in failing to review documents that

would have been necessary to determine whether a benefit cut could be adopted legally

and, if so, the necessary amount of a reduction.

98.      If Plaintiff's dispute concerning the benefit cut could be considered a

claim for benefits, Plaintiff exhausted administrative remedies by Defendants' failure to

adhere to the Benefit Fund's claims procedures with regard to Plaintiff's claim.

Defendants informed Plaintiff that Defendants would direct his correspondence

challenging the benefit cut to the Benefit Fund's outside legal counsel and informed

---

[1] David Stoddard, Milliman, *White Paper: Multiemployer Health and Welfare Fund Statistics: Fall 2019*, *available at*: https://us.milliman.com/-/media/milliman/importedfiles/ektron/multiemployer_health_and_welfare_fund_statistics-fall_2019.ashx.

Plaintiff that questions concerning the benefit reduction should be sent directly to the Benefit Fund's outside legal counsel, contrary to the terms of the SPD which state that claims are submitted to the Plan Administrator. (Ex. G, Notice of Reduction.) Nonetheless, Plaintiff never received a response from the Benefit Fund or its outside counsel regarding the bases for, and the Benefit Fund trustees' authority to make, the cut to Plaintiff's benefit, contrary to the terms of the SPD which state that claims will be decided within 90 days. (Ex. B, SPD at p.3.)

99.     Pursuing internal administrative claim and appeal remedies would be futile with respect to Plaintiff's claims. The disputed decision to cut Plaintiff's Death Benefit by 30% was made by Defendants Fernandez and Meyers, themselves as the trustees, not a subordinate. In addition, Defendants failed to disclose the plan document and other information on which the decision was based and such information would have been needed by Plaintiff to appeal effectively the trustees' decision.

100.     Plaintiffs will serve a copy of this complaint on the Offices of the Secretary of Labor and the Secretary of Treasury pursuant to 29 U.S.C. § 1132(h).

## COUNT I
## FAILURE TO PROVIDE PLAN DOCUMENTS UNDER ERISA
### (Against Defendants Fensler, Meyers, and Fernandez)

101.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 100 of the Complaint as if fully stated herein.

102.     Pursuant to ERISA Section 104(b)(4), a plan administrator is required to provide a participant or beneficiary a copy of "the latest updated summary plan description, and the latest annual report, any terminal report, the bargaining agreement,

trust agreement, contract, or other instruments under which the plan is established or operated" within 30 days of a written request. 29 U.S.C. § 1024(b)(4).

103. The Benefit Fund SPD references participants' rights to information from the fund under ERISA: "ERISA provides that all Plan participants (including beneficiaries) shall be entitled to: examine without charge, at the Plan Administrator's office, all Plan documents, including copies of all documents filed by the Plan with the U.S. Department of Labor, such as detailed annual reports and the Plan description[, and] [o]btain copies of all Plan documents and other Plan information upon written request to the Plan Administrator." Ex. B, SPD at Ch. 7, ¶ H.

104. A plan "administrator" is subject to a penalty in the amount of $110 per day for each day that the administrator fails to provide documents within 30 days of a written request from a participant or beneficiary under 29 U.S.C. § 1132(c)(1). *See* 29 CFR § 2575.502c-1 (increasing penalty from $100 to $110 per day).

105. Each of Defendants Fensler, Fernandez, and Meyers is a plan "administrator" within the meaning of 29 U.S.C. § 1132(c)(1).

106. By failing to provide Plaintiff with a complete copy of the plan document governing Plaintiff's Death Benefit, a complete copy of Plaintiff's Life Insurance Policy, and information related to the purported loan balance on Plaintiff's Life Insurance Policy after Plaintiff's written requests dated May 22, July 6, July 8, and July 15, Defendants are liable to Plaintiff in the amount of $110 per day for each day that they fail to provide Plaintiff a copy of all documents under which the plan is established or operated.

107. Pursuant to 29 U.S.C. § 1132(a)(1)(A), Defendants are also required to furnish Plaintiff with a copy of all instruments under which the plan is established or

operated; that includes documents that were the basis for the adoption of the 30% benefit reduction. Defendants are, therefore, liable to Plaintiff in the amount of $110 per day for each day that they fail to provide Plaintiff a copy of all of these documents as well, following Plaintiff's May 22 request.

108.     Defendants' liability for nondisclosure relates back to Plaintiff's May 22 request. Defendants should have, but did not, disclose all responsive documents required by ERISA within 30 days of May 22. As of the date of the filing of this Complaint, Defendants have failed to provide the complete response and disclosure required by ERISA.

109.     Failure to comply with their statutory disclosure obligation makes Defendants liable to pay Plaintiff penalties in the amount of $110 per day from June 21, through the date all the requested documents are delivered to Plaintiff.

WHEREFORE, Plaintiff respectfully requests a judgment against Defendants Meyers, Fernandez, and Fensler as follows:

(a) Declaring that Defendants breached their obligations under 29 U.S.C. § 1024(b)(4) by failing within 30 days of written request to provide Plaintiff a complete copy of the plan documents governing Plaintiff's benefit, a complete copy of Plaintiff's Life Insurance Policy, and any other instruments under which the plan is established or operated, including documents related to the decision to reduce Plaintiff's Death Benefit by 30%;

(b) Entering judgment against Defendants, individually and severally, in the amount of $110 per day from June 21, 2020, through the date Defendants provide Plaintiff with all the documents under which the plan is established or operated, including documents related to the decision to reduce Plaintiff's Death Benefit by 30%;

(c) Ordering Defendants Meyers, Fernandez, and Fensler to provide Plaintiff with all requested information not yet produced by Defendants as of the date of the judgment;

(d) Awarding attorneys' fees and costs to Plaintiffs as permitted by 29 U.S.C. § 1132(g); and

(e) Awarding any other relief that the Court deems just and proper.

**COUNT II**
**BREACH OF FIDUCIARY DUTY:**
**FAILURE TO ADMINISTER BENEFIT FUND**
**IN ACCORDANCE WITH GOVERNING DOCUMENTS**
**(Against All Defendants)**

110.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 109 of the Complaint as if fully stated herein.

111.    Plaintiff, through his Firm, contributed $300,000 to the Benefit Fund between 1996 and 2003 as consideration for Plaintiff's Death Benefit with a base amount of $1,000,000.

112.    In 2010, the Benefit Fund entered into the 2010 Amendment providing Plaintiff's beneficiaries the right to retain up to $500,000 of the accumulated cash value of Plaintiff's Life Insurance Policy in addition to the $1,000,000 base death benefit upon Plaintiff's death.

113.    Upon payment of the full $300,000 premium, Plaintiff's interest in his Death Benefit vested in the amount of $1,000,000 until Plaintiff was approximately age 90 when the $300,000 premium contributions, plus interest, were projected to no longer cover the cost of insurance in Plaintiff's Life Insurance Policy.

114.    The 2010 Amendment caused Plaintiff's interest in the accumulated cash value of Plaintiff's Life Insurance Policy to vest up to the amount of $500,000.

115.    The Trust Agreement confirms that Plaintiff's rights under his Life Insurance Policy vested. Section 10.6 expressly provides that a Participant's *vested*

interest in in his/her insurance policy may be used as collateral for a loan. (Ex. A at Section 10.6. (emphasis added).)

116.    Unlike the term life insurance benefits provided to bargaining unit employees, which could terminate when the employees were no longer employed by the Firm or employer premium contributions ceased, the Firm's payment of $300,000 on behalf of Plaintiff for a universal life insurance policy provided a vested benefit in the $1,000,000 amount set forth in the Certificate of Benefit and, by the 2010 Amendment, in the accumulated cash value of the policy.

117.    The Trust Agreement provides that the "Trustees shall use the assets of the Trust to pay or provide . . . benefits . . . in accordance with the terms and conditions of the Plan of Benefits adopted by the Trustees[.]"  (Ex. A at Section 5.1.)

118.    The Trust Agreement also provides that no amendment to the Trust "shall authorize or permit any part of the Trust Fund . . . to be used for or diverted to purposes other than for the exclusive benefit of the Participants or their Beneficiaries or estates." (Ex. A at Section 9.1.) Defendants have provided Plaintiff with no plan of benefits that would authorize Defendants to reduce Plaintiff's Death Benefit in order to pay administrative costs of the Benefit Fund or to cover the life insurance benefits of other non-union participants who purchased universal life policies for themselves, or for any other reason.

119.    By reducing Plaintiffs' Death Benefit by 30%, Defendants have breached the terms of the plan governing Plaintiff's Death Benefit, Plaintiff's Life Insurance Policy, and the Trust Agreement.

120.     Pursuant to 29 U.S.C. § 1132(a)(1)(B) or 29 U.S.C. § 1132(a)(3), Plaintiff is entitled to an order enjoining Defendants from reducing Plaintiff's vested interest in his Death Benefit and declaring that, so long as the accumulated cash value in Plaintiff's Life Insurance Policy is sufficient to cover the cost of insurance, Plaintiff's vested interest in his Death Benefit entitles his designated beneficiaries to the $1,000,000 base amount of Plaintiff's Life Insurance Policy plus the accumulated cash value of the policy up to the amount of $500,000, upon Plaintiff's death. Plaintiff is also entitled to an order providing that, if Plaintiff desires continuation of Plaintiff's Life Insurance Policy beyond such point, he may do so in accordance with the terms of Plaintiff's Life Insurance Policy, including by making any necessary additional premium contributions.

WHEREFORE, Plaintiff respectfully requests a judgment against Defendants as follows:

(a)  Declaring that, until such time as the accumulated cash value in Plaintiff's Life Insurance Policy is insufficient to cover the cost of insurance, Plaintiff's vested interest in Plaintiff's Death Benefit entitles his designated beneficiaries to the $1,000,000 base death benefit plus the accumulated cash value of the policy up to the amount of $500,000, upon Plaintiff's death;

(b)  Declaring that any reduction by the Defendants of Plaintiff's Death Benefit funded by Plaintiff's Life Insurance Policy violates the terms of the plan governing Plaintiff's Death Benefit, the Trust Agreement, the 2010 Amendment, and Plaintiff's Life Insurance Policy;

(c)  Declaring that under the terms of the plan governing Plaintiff's Death Benefit and Plaintiff's Life Insurance Policy, Plaintiff would have the right to continue life insurance coverage beyond such time when the accumulated cash value of the policy is insufficient to cover the cost of insurance, in accordance with the terms of Plaintiff's Life Insurance Policy, including by making any additional premium contributions to the policy set by the insurance company;

(d)  Enjoining Defendants from taking any action to reduce the value of Plaintiff's Death Benefit or Plaintiff's Life Insurance Policy, or to the extent Defendants have already taken any action to reduce the value of Plaintiff's Death Benefit

31

329b06548d1c6f1b

or Plaintiff's Life Insurance Policy, ordering Defendants to restore the value to the amount to which he is entitled under the terms of the plan;

(e) Awarding attorneys' fees and costs to Plaintiff as permitted by 29 U.S.C. § 1132(g); and

(f) Awarding any other relief that the Court deems just and proper.

## COUNT III
## BREACH OF FIDUCIARY DUTY:
## <u>REDUCING THE VALUE OF PLAINTIFF'S DEATH BENEFIT</u>
### (Against Defendants Meyers, Fernandez, and Fensler)

121.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 120 of the Complaint as if fully stated herein.

122.    Section 404(a)(1)(A)(i) & (ii) of ERISA provides that a fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (1) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A)(i) & (ii).

123.    Section 404(a)(1)(B) of ERISA provides that a fiduciary must "discharge his duties with respect to a plan . . . with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

124.    Each of Defendants Fensler, Fernandez, and Meyers is a fiduciary within the meaning of ERISA Section 404.

125.    The Trust Agreement provides that the trustees can amend the Trust from time to time, but "no such amendment shall authorize or permit any part of the Trust

32

Fund . . . to be used for or diverted to purposes other than for the exclusive benefit of the Participants or their Beneficiaries or estates." (Ex. A, Section 9.1.)

126.    When amending the plan to reduce benefits of participants and beneficiaries, the trustees have an obligation to do so in accordance with their fiduciary duties to participants and beneficiaries.

127.    Defendants informed Plaintiff in May 2020 that they had reduced the life insurance benefit for participants 65 and over in order to "maintain the integrity of [the Benefit Fund], strengthen and assure continuance of the Trust into the future." (Ex. C.)

128.    To the extent that any plan document might have authorized Defendants to adopt a benefit reduction, Defendants, if taking action as informed fiduciaries, should have reviewed documents containing information such as (1) annual income and expense history, (2) projected administrative costs, (3) effects of the insurance policies, including current and future cash values and the effect of guaranteed interest earnings on premiums paid to insurers, (4) an actuarial report detailing the Benefit Fund's reserved assets, the appropriate allocation of investments and earnings assumptions, the future liabilities for death benefits based on the amounts of vested benefits and the expected longevity of vested participants reflected in mortality tables.

129.    Defendants have failed to produce any documents or other evidence to demonstrate that they reduced Participants' death benefits by 30% in the best interest of participants and beneficiaries.

130.    Plaintiff requested the information from Defendants upon which they relied in reaching the decision to reduce Plaintiff's Death Benefit. Defendants have so far

failed or been unable to provide any documents or information substantiating how they reached their decision and how the decision would benefit participants.

131.    In response to Plaintiff's request to the individual Defendants for "all documents comprising the 'review' of the Trust" which formed the Trustees purported basis for the announced 30% reduction in benefits, including Plaintiff's, Defendant Fensler represented that "there were no documents that relate to the 30% reduction in benefits decision."

132.    No ERISA plan trustee, discharging his or her duties "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," 29 U.S.C. § 1104(a)(1)(B), and acting solely in the interest of plan participants and beneficiaries, could decide to implement a blanket 30% reduction in participant death benefits without reviewing or relying on advice of qualified experts and the information in documents such as those set forth in paragraph 128 above.

133.    By announcing a 30% reduction in Plaintiff's Death Benefit without having first reviewed or relied on any documents demonstrating a need for such a reduction, Defendants breached their fiduciary duties under ERISA.

134.    To the extent Defendants had any authority to reduce Plaintiff's Death Benefit (and Plaintiff disputes that they had such authority), Plaintiff is entitled to information, including any financial information, opinions, and analysis relied upon by the Defendants, in reaching their decision to reduce Plaintiff's Death Benefit, assuming such information and documents do exist contrary to Defendant Fensler's representation.

34

135. By failing to provide information to Plaintiff demonstrating how Defendants arrived at their decision to reduce his benefit, if such information exists, Defendants have breached their fiduciary duties.

136. To the extent that Defendants contend they needed to reduce benefits based on the financial integrity of the Benefit Fund, Plaintiff is entitled to an accounting of the Benefit Fund's finances demonstrating the financial need for reducing benefits. Without an accounting, Defendants are unable to show that a 30% or other benefit reduction is required to maintain the Benefit Fund in the interests of participants.

137. To the extent that the Benefit Fund has experienced any financial distress requiring it to reduce participants' death benefits, it is imperative that Defendants provide an accounting of how the loan balance write-offs reflected in the Benefit Fund's Form 5500s and loan balances to participants that exceed the cash-surrender value of the underlying policies have impacted the Benefit Fund's finances and have factored into the trustees' decision to reduce Plaintiff's Death Benefit. Without an accounting, Defendants are unable to show that any financial distress of the Benefit Fund did not result from their fiduciary breaches in authorizing millions of dollars in loans to Participants, loans that were defaulted and not secured by the accumulated value of insurance policies.

WHEREFORE, pursuant to 29 U.S.C. §§ 1132(a)(2) and/or (a)(3), Plaintiffs respectfully request a judgment against Defendants as follows:

(a) Declaring that Defendants have breached their fiduciary duties by failing to account for how the Defendants arrived at their decision to reduce Plaintiff's Death Benefit or rights under Plaintiff's Life Insurance Policy;

(b) Enjoining Defendants from taking any action to reduce the value of Plaintiff's Death Benefit or Plaintiff's Life Insurance Policy and ordering Defendants to restore the value of Plaintiff's Death Benefit and Plaintiff's Life Insurance Policy to the amount to which he is entitled under the terms of the plan;

(c) Requiring Defendants to provide an accounting of all of the Benefit Fund's finances, including all compensation paid to Benefit Fund employees and service providers and all loans between 2012 and the present, and all losses from defaulted loans;

(d) Requiring Defendants to restore any losses to the Benefit Fund revealed through an accounting to have resulted from any fiduciary breaches by Defendants;

(e) Requiring Defendants to transfer ownership and control of Plaintiff's Life Insurance Policy to Plaintiff.

(f) Awarding attorneys' fees and costs to Plaintiff as permitted by law, including but not limited to 29 U.S.C. § 1132(g); and

(g) Awarding any other relief that the Court deems just and proper.

**COUNT IV**
**FAILURE TO TERMINATE TRUST**
**IN ACCORDANCE WITH TRUST AGREEMENT**
**(Against All Defendants)**

138.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 137 of the Complaint as if fully stated herein.

139.    The Trust Agreement requires that the "Trust shall terminate upon the occurrence of one or more of the following: (a) the termination of the obligation of all Employers to make contributions; . . . ."

140.    The 2018 Form 5500 completed by the Benefit Fund requires the Benefit Fund to identify the "total number of employers obligated to contribute to the plan," to which the Benefit Fund entered "0."

141.    Therefore, as of 2018, if not earlier, there was "a termination of the obligation of all employers to make contributions" and the Defendants were obligated to terminate the Benefit Fund.

36

142.    Upon termination, the Benefit Fund was required to "first pay any obligations of the Trust;" and then "any remaining assets shall be used at the discretion of the Trustees to provide benefits for Participants covered at the time of termination of the Agreement consistent with the purposes of the Trust." (Ex. A at Section 9.4.)

143.    Because the Plaintiff's Death Benefit is fully funded by Plaintiff's Life Insurance Policy for which the Firm contributed on behalf of Plaintiff the full premium of $300,000, upon termination of the Benefit Fund, the Benefit Fund has an obligation to transfer or assign ownership of the policy to Plaintiff.

144.    The failure to transfer or assign Plaintiff's Life Insurance Policy to Plaintiff upon the initial cessation of employer contributions to the Benefit Fund constitutes a violation of the terms of the Trust Agreement and a breach of fiduciary duty by Defendants.

145.    To the extent that the continuation of the Benefit Fund beyond the initial cessation of employer contributions to the Benefit Fund has caused any losses to the fund such as, for example, through approving loans to Participants, failing to require loan repayment and writing off of Benefit Fund assets as a result of loan defaults, Defendants have an obligation to restore those losses to the Benefit Fund.

146.    To the extent that the assets of the Benefit Fund have been reduced as a result of excessive administrative expenses, Defendants have an obligation to restore those losses to the fund.

147.    Upon termination of the Benefit Fund, any fund assets in excess of the assets held by insurance companies in connection with the universal life policies, which policies with their accumulated value should be transferred to the respective Participants,

should be paid either to participants, or at their direction, to their insurance companies to provide for extended eligibility for life insurance coverage.

WHEREFORE, pursuant to 29 U.S.C. § 1132(a)(1)(B), or, in the alternative, 29 U.S.C. § 1132(a)(3), Plaintiffs respectfully request a judgment against Defendants as follows:

(a) Declaring that the Benefit Fund is required to be terminated and its assets distributed to participants and that the asset created by Plaintiff's Firm on his behalf, Plaintiff's Life Insurance Policy, should be transferred to Plaintiff's ownership;

(b) Ordering Defendants to transfer ownership of Plaintiff's Life Insurance Policy to Plaintiff;

(c) Requiring Defendants to provide an accounting of the loan charged against Plaintiff's Life Insurance Policy and to restore to Plaintiff the amount of the loan and interest thereon charged against the accumulated value of Plaintiff's Life Insurance Policy;

(d) Requiring an accounting of the administrative costs charged against the Benefit Fund since the date the Benefit Fund should have been terminated and an accounting of any losses arising from Defendants' prior or subsequent issuing of loans to participants, failing to obtain loan repayments and writing off the losses from such loans;

(e) Ordering Defendants to reimburse the Benefit Fund for any losses from improper administration of the Benefit Fund;

(f) Ordering Defendants or, if they are removed as trustees, then their successor trustees, to terminate the Benefit Fund and to distribute the assets of the Benefit Fund to participants in accordance with a termination and distribution plan to be approved by the Court;

(g) Declaring that the individual Defendants have conflicts of interest in connection with the required accounting and termination of the Benefit Fund;

(h) Removing the individual Defendants as trustees and as administrator because of their fiduciary breaches and conflicts of interest in connection with the required accounting, and appointing a trustee or special master to manage the accounting, and termination of the Benefit Fund, and distribution of any residual assets to participants.

(i)   Awarding attorneys' fees and costs to Plaintiff as permitted by law, including but not limited to 29 U.S.C. § 1132(g); and

(j)   Awarding any other relief that the Court deems just and proper.


J. Peter Dowd (ARDC# 0667552)                    Respectfully submitted,
George A. Luscombe III (ARDC# 6290097)
Elizabeth L. Rowe (ARDC# 6316967)                /s/ Elizabeth L. Rowe
DOWD, BLOCH, BENNETT, CERVONE,                   Elizabeth L. Rowe
    AUERBACH & YOKICH         An Attorney for the Plaintiffs
8 S. Michigan Ave. – 19th Floor
Chicago, IL 60602
Tel: 312-372-1361
Fax: 312-372-6599
Email: erowe@laboradvocates.com
    efile@laboradvocates.com